**GARFIELD OIL CO. v. CHAMPLIN et al.**

No. 9326—Opinion Filed Jan. 13, 1920.

Rehearing Denied April 13, 1920.

(Syllabus by the Court.)

**1. Pleading—Answer—Requisites and Latitude.**

Under paragraph 3, sec. 4745, Rev. Laws 1910, the defendant may set forth in his answer as many grounds of defense, counterclaim, setoff, and for relief, as he may have, whether they be such as have been heretofore denominated legal or equitable, or both. Each must be separately stated and numbered, and they must refer in an intelligible manner to the cause of action which they are intended to answer, and even if the defenses are inconsistent, unless expressly prohibited by statute, they may still be united in one answer, and the pleader cannot be compelled to elect between such defenses.

**2. Oil and Gas—Action to Cancel Lease—Defense—Mistake in Contract.**

Defendant alleged in its answer that on or about the 23d day of February, 1916, the date upon which plaintiffs' lease was executed, the Chanute Refining Co. and B. A. Garber had procured leases upon a large number of tracts of land in Garfield county; that prior thereto, oil and gas had not been discovered within many miles of said tracts of land; that the leases were obtained for the purpose of exploring said land for oil and gas; that the lands at that time had no value whatever for oil or gas mining purposes; that plaintiffs knew that said leases, and each of them, were secured to constitute a block of acreage sufficiently large to justify the expenditure of a large sum of money in prospecting said lands for oil and gas; and well knew that the lessees would not undertake to prospect said tract of land, or any part thereof, for oil and gas, unless a sufficient number of acres were included in said block to make the financial returns to the lessees sufficient, in case oil or gas was discovered. to justify them in taking the chance of the great loss of time and money in case of failure upon their part to discover oil and gas; that plaintiffs executed said lease for the purpose of including the land therein described in the acreage to be contained in said block of acreage, in order to induce the lessees to prospect the same for oil

and gas; that it was understood and agreed by and between the lessees and the plaintiff that should the lessees commence a well within six months on the said tracts of land, or any of them, in that event no rental should be due or paid under the lease, but that the commencing of said well should be in lieu of all rentals; that said lease was executed upon a printed form: that at the time of its execution, that portion of the printed lease providing for the completion of a well on the premises leased on or before a certain date, was inadvertently allowed and permitted to remain in said lease; that the blanks in said part of said printed lease were filled in so that the printed portion of the lease required the lessees to complete a well on said premises on or before the 23d day of August, 1916, but that the true agreement and understanding of said parties was expressed, and intended to be expressed, by the last clause of the lease made in writing upon said printed form, which reads as follows, to wit: 'Second party agrees to commence drilling a well within six months on the block of leases, of which this is a part.' Held, that the answer stated facts sufficient to constitute a defense to the cause of action set forth in the amended petition of the plaintiffs; and that the trial court erred in sustaining the special demurrer thereto.

### 3. Oil and Gas—Lease—Rule of Construction.

Oil and gas leases in this jurisdiction are construed strongly against the lessee, and in favor of the lessor, and where its terms will permit it under the rules of law, such lease will be construed so as to promote development and prevent delay.

### 4. Same—Termination of Lease—Time as of Essence of Contract.

Where an oil and gas lease expressly provides that rights of parties shall terminate if no well be drilled within a fixed period unless the lessee on or before that date shall pay or tender to the lessor a fixed sum, time is of the essence of the contract.

### 5. Same — Nature of Grant — "Unless" Leases—Construction.

Under the decisions in this state, oil and gas, while in the earth, unlike solid minerals, are not subject to ownership distinct from the soil, and the grant of the oil therefore is a grant, not of the oil that is in the ground, but of such a part as the grantee may find. An "unless" lease is subject to termination at the will of the lessee, which privilege may be exercised by a mere failure to pay the stipulated rental at the time due, upon the happening of which the lease automatically terminates, and the lessor cannot maintain an action against the lessee for rentals.

### 6. Same—Construction of Lease.

Where a party leases a tract of land for the sole and only purpose of mining and operating for oil and gas, the laying of pipe lines, and of building tanks, towers, stations, and structures thereon to produce, save, and take care of said products, the lessee contracting to deliver to the credit of the lessor, free of cost, in the pipe line to which they may connect their wells, the equal one-eighth part of all oil produced and saved from the leased premises, and to pay $250 each year in advance for the gas from each well where gas only is found, while the same is being used off the premises, at the rate of $50 per year for the time during which said gas shall be used; and the lease containing the following provision: "If no well be completed on said land on or before the 23d day of August, 1916, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to the lessor's credit in the First National Bank, at Medford, Okla., or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of $80, which shall operate as a rental and cover the privilege of deferring the completion of a well for six months from said date. In like manner, and upon like payments or tenders, the completion of a well may be further deferred for like periods of the same number of months successively, and it is understood and agreed that the consideration first recited herein, the down-payment, covers not only the privilege granted to the date when said first rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid, and any and all other rights conferred. If while this lease is in force, and prior to the discovery of oil or gas on said leased land, there shall be drilled on adjacent land and within 200 feet of any line of said leased land, a well producing as much as 25 barrels of oil per day for 30 consecutive days, the lessee will, with reasonable diligence, begin and prosecute the drilling of a well on said leased land in a faithful effort to find and produce oil in paying quantities. * * * "Second party agrees to commence drilling a well within six months on the block of leases, of which this is a part." Held, that this provision did not bind the lessee to pay any rent for the land, or for delay in commencing to operate for oil and gas, said grant or lease amounting to an option, preventing the lessor after receiving the consideration for the first six months from leasing and entering during such time, the lessee having the option by continuing to pay such half-yearly payments to continue such option by such succeeding payments, it not appearing that the lessor had any direct interest in the drilling of any wells to be commenced within six months on the block of leases of which this lease was a part.

### 7. Same—Termination—Mere Ignorance of Contents.

Mere ignorance of the contents of a lease on the part of one who becomes a party thereto is not sufficient to excuse non-compliance therewith. The lessee is bound by its terms, and where under the terms of an "unless" lease, the lease terminated if a well was not

completed in six months from the date thereof, or rentals paid as therein provided, the failure to complete a well, or pay the rentals within the time stipulated, automatically terminated the lease.

Error from District Court, Garfield County; James B. Cullison, Judge.

Action by H. H. Champlin and others against the Garfield Oil Company. Judgment for plaintiffs, and defendant brings error. Affirmed in part and reversed in part, and remanded.

M. C. Garber, Ralph W. Garrett, Edw. H. Chandler, Farrar L. McCain, Summers Hardy, Jos. C. Stone, Chas. A. Moon, and Francis Stewart, for plaintiff in error.

H. G. McKeever, W. L. Moore, and Burford, Miley, Hoffman & Burford, for defendants in error.

PITCHFORD, J. In the court below defendants in error were plaintiffs; plaintiff in error was defendant. For convenience, the parties will be designated as they appeared in the trial court. This is an action by the plaintiffs to cancel an oil and gas lease given by the plaintiffs George Beggs and Abbie N. Beggs to the Chanute Refining Co. on the 23d day of February, 1916, which lease was assigned by the Chanute Refining Co. to the defendant, Garfield Oil Co., for alleged failure upon the part of the defendant to complete a well or pay rentals on or before the 23d day of August, 1916. The plaintiff Champlin claims to be the owner of an oil and gas lease from the plaintiffs George Beggs and Abbie N. Beggs to the premises in controversy under date of August 30, 1916. The defendant filed an answer, setting up several separate defenses, and a cross-petition asking for the cancellation of the plaintiff Champlin's lease. The lease executed to the defendant provided:

"If no well be completed on said land on or before the 23d day of August, 1916, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay, or tender to the lessor, or to the lessor's credit in the First National Bank, at Medford, Okla., or its successors, which shall continue as the depository, regardless of changes in the ownership of said land, the sum of $80, which shall operate as a rental and cover the privilege of deferring the completion of the well for six months. from said date."

The separate defenses Nos. 1, 2, and 3 will be treated together and designated as defense No. 1. In these it was alleged that on the 23d day of February, 1916, the date upon which plaintiffs' lease was executed, the Chanute Refining Co. and B. A. Garber had procured leases upon a large number of tracts of land in Garfield county; that on or about the 23d day of February, 1916, oil and gas had not been discovered within many miles of said tracts of land or any of them; that said leases were obtained for the purpose of exploring said tract or tracts of land for oil and gas; that said tracts of land and the premises in controversy, at that date had no value whatever for oil or gas mining purposes; that oil and gas mining leases thereon were of no worth or value; that at that time the plaintiffs knew that said land had no value for oil or gas mining purposes, and knew that it was extremely doubtful as to whether or not said tracts of land, or any of them, contained oil or gas; that plaintiffs knew that said leases, and each of them were secured to constitute a block of acreage sufficiently large to justify the expenditure of a large sum of money in prospecting said land for oil and gas, and well knew that said Chanute Refining Co. and B. A. Garber, their successors or assigns, would not undertake to prospect said tract, or any part thereof, for oil and gas, unless a sufficient number of acres were included in said block to make the financial returns to the lessees and their successors or assigns sufficient, in case oil or gas were discovered, to justify them in taking the chance of the great loss of time and money in case of failure upon their part to discover oil and gas; that plaintiffs executed said lease for the purpose of including the land therein described in the acreage to be contained in said block of acreage, in order to induce the lessees, their successors or assigns, to prospect the same for oil and gas; that it was understood and agreed by and between the Chanute Refining Co. and said plaintiffs that should the Chanute Refining Co. commence a well within six months on the said tracts of land, or any of them, then and in that event no rental should be due or paid by said Chanute Refining Co. under said lease, but that the commencing of said well should be in lieu of all rentals, and the only obligation upon the part of the Chanute Refining Co., under the terms of said lease, would be in case oil and gas should be discovered by the completion of said well so commenced, that said plaintiffs' premises, would, with reasonable diligence, be prospected for oil and gas.

It was also stated that said lease was executed upon a printed form, and that at the time of its execution that portion of said printed lease providing for the completion of a well on the premises leased by plaintiffs, on or before a certain date, was inadvertently allowed and permitted to remain in said lease, and that the blanks in said part of said printed lease were filled in so that the printed portion of the lease required

the Chanute Refining Co., its successors or assigns, to complete a well on said premises on or before the 23d day of August, 1916; but that the true agreement and understanding of said parties was expressed and intended to be expressed, by the last clause of the lease made in writing upon said printed form, which reads as follows, to wit:

"Second party agrees to commence drilling a well within six months on the block of leases of which this is a part."

It was further alleged that the defendant had complied with all the provisions of the lease contract in regard to drilling the well on the block of leases of which this is a part; that on or before the expiration of the six months period provided for, to wit, on the 4th day of June, 1916, it commenced the drilling of an oil well on a tract of land, which was part and parcel of the land leased to the Chanute Refining Co., and continued drilling the well continuously from day to day until oil was discovered in paying quantities: that it expended large sums of money in the drilling of said well, to wit, $20,000.

For a further defense, designated as the fifth subdivision of the answer, it was alleged that at all times since the 23d day of February, 1916, one Walter Campbell was secretary and treasurer of the defendant company, and had charge of the books and accounts and general office work of the defendant company, and looked after the payment of rentals on oil and gas leases owned by the defendant company, including the oil and gas lease in controversy; that the said Campbell not only was secretary and treasurer of the defendant company, but was engaged in various other business enterprises, and was an officer and had charge of the affairs of various other companies and corporations; that on account of the volume of business transacted by the defendant company through the office of the said Campbell, and the volume of business transacted by the said Campbell, and the number of oil and gas leases owned by the defendant company, it was impossible for the said Campbell, as secretary and treasurer of said company, to have a direct personal knowledge of the dates upon which rentals on any particular oil and gas lease became due; that the said Campbell had under him various subordinates, whose duty it was to keep the records of said company and of various other companies, corporations, and businesses looked after by the said Campbell, and whose duty it was to keep track of and see that the oil and gas rentals due on leases owned by the defendant company and other companies under the control and management of the said Campbell, as aforesaid, were promptly paid, including the oil and gas lease in controversy; that on or about the 1st day of August, 1916, that portion of said Campbell's office work dealing with the payment of oil and gas leases owned by the defendant, Garfield Oil Co., and other companies which were under his management and control, and the oil and gas lease in controversy, was changed from the office of Walter Campbell and placed under the care and supervision of one Paul Konz; that Konz was instructed by the Garfield Oil Co. and the said Walter Campbell, and it was part and parcel of his particular duties, and a part and parcel of the duties of each and every subordinate of said Paul Konz, and each and every subordinate of said Paul Kons was instructed by the said Paul Konz, to see that the oil and gas rentals on the lease in controversy were promptly paid on or before the date stipulated and provided in said lease. And, further, that at the time of the transfer of said lease payment work from the office of Campbell to the office of Konz, the block of leased acreage of which the lease in controversy is a part consisted of between 13,000 and 14,000 acres, and that all the leases in said acreage provided for the payment of rentals annually with the exception of five only, which five provided for the payment of rentals semi-annually, among which was the lease in controversy; that the said Paul Konz, by inadvertence, accident, unavoidable casualty, and mistake, was informed by the servants, agents, and employes of the defendant company having the custody of said leases and the payment of rentals thereon, prior to the time said leases and the payment of said rentals were taken over by the said Paul Konz, that all the leases in said acreage, including the lease in controversy, provided for the payment of rentals annually, and in the exercise of due diligence in the performance of his duties in the payment of said rentals he did not discover said mistake, and that the rentals in the lease in controversy were payable semi-annually, until three days after the first payment thereon is alleged to have become due, to wit, August 23, 1916; that immediately upon learning of the provision in said lease providing for said rentals, on August 26, 1916, the defendant company caused to be deposited in the First National Bank of Medford, Okla., the depository agreed upon and designated in said lease, the amount of said rental provided for in said lease, to the credit of George Beggs and Abbie N. Beggs, and on the 28th of August, the rentals were tendered to the plaintiffs George Beggs and Abbie N. Beggs.

Plaintiffs demurred to defendant's answer,

which demurrer was sustained. Defendant appeals.

It will be observed from the foregoing statement that the defendant relies upon two main defenses; the first being that the printed provision in the lease requiring the completion of the first well within six months, or the termination of the lease unless the lessee should pay $80 rental for an extension of the time for the drilling of the first well on the tract in controversy, is in conflict with the written provision requiring the lessee "to commence drilling a well within six months on the block of leases, of which this is a part," contending that the written provision must prevail over the printed part, thereby making the contract definite and certain in all its parts.

The second ground relied upon is that by inadvertence, accident, unavoidable casualty, and mistake, the agent whose duty it was to pay the rentals was informed by the servants, agents, and employes of the defendant company having the custody of the leases and the payment of rentals thereon, including the lease in controversy, that the lease provided for the payment of rentals annually; that he did not discover that the rentals on the lease in controversy were payable semi-annually until three days after the first payment thereon is alleged to have become due; that immediately upon learning of the provision in said lease providing for said rentals, to wit, on the 26th day of August, 1916, the defendant company caused to be deposited in the bank agreed upon and designated in said lease the amount of the rental provided for in the lease, to the credit of George Beggs and Abbie N. Beggs; that in the exercise of due diligence and proceeding with the utmost dispatch, the defendant, through its authorized agent, tendered said rental to the said George Beggs and Abbie N. Beggs on the 28th day of August, 1916, or within five days after said rentals became due.

Are these defenses inconsistent and contradictory, and, if so, are they prohibited by statute?

We have seen the answer contains the statement that by the terms of the lease the defendant was not required to pay any rentals under the lease in controversy, provided it commenced drilling a well within six months on the block of leases of which this is a part; that it complied with this condition; that on the 23d day of August, 1916, the time the rentals were due as specified in the lease, the defendant was engaged in drilling a well upon the Hoy tract, which was contained in the block of leases of which this lease is a part This being the case,

then, so far as the defendant was concerned, no rentals were due on the 23d day of August, 1916, and no effort was made to pay the same. Had the defendant rested his contention upon this ground, then there could be no claim of inconsistency in the defense. But in the amendment to the answer the claim is made that, notwithstanding the fact that the "unless" clause was inadvertently left in the lease, it intended to pay the rentals therein provided for, but that by reason of the great number of leases owned by the defendant in Garfield county, covering something like 13,000 or 14,000 acres, and all the leases, except the lease in controversy. and four others, provided for annual rentals instead of semi-annual, as in this lease. the defendant was misled and lulled into a false security; that it was under the impression that no rentals were due on the 23d of August, 1916, but as soon as it discovered that rentals were due on that date, it immediately deposited the rentals in the bank, being the depository named in the lease, and on the 28th tendered the rentals to the plaintiffs George and Abbie N Beggs

The third paragraph of section 4745, Rev. Laws 1910, provides that the defendant may set forth in his answer as many grounds of defense, counterclaim, setoff, and for relief, as he may have, whether they be such as have been heretofore denominated legal or equitable, or both. Each must be separately stated and numbered and must refer in an intelligible manner to the causes of action which they are intended to answer.

Plaintiffs contend that the defenses are inconsistent and contradictory. Admit they are, still such defenses under the decisions of this court, are authorized, unless prohibited by statute. In Oklahoma Hay & Grain Co. v. T. D. Randall & Co., 66 Oklahoma, 168 Pac. 1012, the first paragraph of the syllabus is as follows:

"When the answer to a petition sets forth in each of two separate paragraphs a different state of facts, each of which state of facts constitutes a defense, counterclaim, or set-off, the defendant cannot be required to elect upon which one of such counts he will proceed to trial."

But when the defendant states it intended to pay the rentals, notwithstanding the same were contained in the lease by inadvertence, and that the written portion added to the lease was to control, we cannot say the defenses were inconsistent, or that they were contradictory. In the case of Emerson-Brantingham Implement Co. v. Ware et al., 71 Oklahoma, 174 Pac. 1066, Rainey, J., said:

"The principal contention made by counsel for plaintiff is that the defendants in

their pleadings alleged, and in their evidence attempted to prove inconsistent defenses, and that the jury was instructed on inconsistent theories. This contention is without merit, for this court, in the early case of Covington v. Fisher, 22 Okla. 207, 97 Pac. 615, in an opinion by Mr. Justice Kane, held that the defendant may unite in his answer inconsistent defenses, unless they are expressly prohibited by statute, and that the pleader cannot be compelled to elect between such defenses. This case is followed in the recent case of Oklahoma Hay & Grain Co. v. T. D. Randall & Co., 66 Oklahoma, 168 Pac. 1012."

We are therefore of the opinion that the trial court erred in sustaining the special demurrer to this defense.

The defendant contends that, by reason of the facts stated in the amended answer, equity should intervene to relieve it of its failure to pay or tender the rentals within the time due. The forms of leases are prepared by the lessee, and not by the lessors. We have what is known as the "or" lease and the "unless" lease. In the case of the "or" lease, the lessee surrenders by the payment of the consideration, usually nominal, for his privilege of surrender, and by the execution and delivery of a release, and upon failure so to surrender by this exclusive method the lessee becomes bound for the payment of the rental for another term. In order to avoid this additional labor in terminating the lease, the "unless" lease was provided, wherein the lessee may surrender merely by his failure or refusal to pay the rental. The lease thereby automatically terminates. In the case of the "or" lease, the lessee abandons his lease by the formal act and in the manner described in the lease, and in the "unless" lease, the lessee abandons his lease merely by failing to pay the rental, by the payment of which he could extend the time for development another term. Resulting from these different methods of surrender, the lessor cannot hold the lessee for rental in default in the case of an "unless" lease, but can hold the lessee for rental in default in the case of an "or" lease.

The defendant contends that the lease passed a vested interest in the premises, and that it is immaterial how this vested interest may be defined or described, whether it is called an interest in the land, a chattel real, or right of exploration, and that under the circumstances of this case equity should not divest this vested interest; in other words, that equity should not decree a forfeiture. In Curtis v. Harris, 76 Okla. 226, Owen, C. J., in delivering the opinion, said:

"Under the express and unequivocal terms of the lease, the rights of both parties were to terminate January 8, 1917, if a well was not completed, unless the lessee elected to avail himself of the option to delay the completion of such well by paying the stipulated rental in advance. The lessee was not bound to pay the rental, but payment was a condition precedent to his right to defer drilling. The rule contended for, which seeks to prevent forfeiture, has no application. The lease terminated by its terms on the 8th of January, no well having been drilled, no payment tendered, and no facts appearing that amount to a sufficient legal excuse to relieve the lessee from the effect of neither completing a well nor paying the stipulated rental."

In the case of Cohn v. Clark, 48 Okla. 500, 150 Pac. 467, the fourth section of the syllabus is as follows:

"A provision, forfeiting a lease on failure of the lessee to fulfill the terms of the contract, is for the benefit of the lessor only, and he alone can take advantage of the same, unless there is an expressed stipulation in the contract that the lease shall become null and void, unless the lessee shall either drill within a certain time or pay the rental, or words of similar import."

The lease under consideration is of similar import, in that it terminates as to both parties unless the rental is paid, instead of using the term "null and void." In McKee v. Grimm, 57 Okla. 680, 157 Pac. 308, in the body of the opinion, on page 310, we find the following:

"As stated by the court in Cohn v. Clark, supra, parties may so word their contract that a failure to commence operations within the time specified, or to pay the rents, will, ipso facto, render the lease null and void, and automatically relieve the lessee of liability." Citing the case of Deming Inv. Co. v. Lanham, 36 Okla. 773, 130 Pac. 260, 44 L. R. A. (N. S.) 50.

In the case of the Eastern Oil Co. v. Beatty, 71 Oklahoma, 177 Pac. 104, it was held, in effect, that there remained to the lessee the option to pay for delay and thus keep the lease alive, or not pay and thereby let it die.

In Melton v. Cherokee Oil & Gas Co., 67 Oklahoma, 170 Pac. 691, the first section of the syllabus is as follows:

"An oil and gas lease containing a stipulation on the part of the lessee to commence operation on the premises within a year from a date certain, or pay for delay, conferred on the lessee an option to drill or pay, and a failure to do either rendered the same forfeitable at the choice of the lessor."

In Mitchell v. Probst, 52 Okla. 10, 152 Pac. 597, the court said:

"Apply the principles settled in these cases to the case at bar. The plaintiffs in error had only a license to explore the land

for gas and oil for the time mentioned in the lease, with an option to extend the license upon the payment of the sums provided in the lease at the time therein set out. The plaintiffs in error never took possession, did nothing towards exploring the land for gas and oil, and failed to secure a prolongation of their license by making the payment for this privilege at the agreed time. As construed by this court in the cases above cited, the legal effect of the contract was that, if a well was not drilled on the land in one year from the date of the contract, the agreement should be null and void, but with an option to the plaintiffs in error to continue their license under the agreement by paying in advance a rental of $2.50 per acre for the first year, and $5.00 per acre thereafter until a well was drilled or the lease canceled. They now ask this court to change their contract by allowing them to pay the same for the extension of the option to some other time than that specified in the contract."

In the case of the Northwestern Oil & Gas Co. v. Branine, 71 Oklahoma, 175 Pac. 533, at the bottom of page 535, the court says:

"Such a lease is subject to termination at the will of the lessee, which privilege may be exercised by a mere failure to pay the stipulated rental at the time due, upon the happening of which the lease automatically terminates, and the lessor cannot maintain an action against the lessee for rentals."

In Hoyt v. Fixico, 71 Oklahoma, 175 Pac. 517, the court says:

"While, strictly speaking, an oil and gas mining lease does not convey an estate in the realty prior to the development of the leased premises, it operates to pass the immediate and exclusive right of possession of the land for the purposes named in the lease, and, upon the discovery of oil or gas, or either of them, the lessee acquires a vested right to extract and remove from the premises and apply to his own use the oil and gas found therein, and such a lease is an alienation of that part of the land which the lessee takes from it, converts into personal property, and appropriates to his own use."

In Kolachny v. Galbreath et al., 26 Okla. 772, 110 Pac. 902, the court said:

"The lease relied upon by the plaintiff does not vest in him the title to oil and gas in said land, and is not a grant of any estate therein, but is simply a grant of a right to prospect for oil and gas, no title vesting until such substances are reduced to possession by extracting same from the earth— an incorporeal hereditament."

In the case of Rich v. Doneghey, 71 Oklahoma, 177 Pac. 86, the court said:

"But with respect to such oil and gas, they had certain rights designated by the same courts as a qualified ownership thereof, but which may be more accurately stated as exclusive rights, subject to legislative control against waste and the like, to

erect structures on the surface of their land, and explore therefor by drilling wells through the underlying strata and to take therefrom and reduce to possession, and thus acquire absolute title as personal property, to such as might be found and obtained thereby. This right is the proper subject of sale, and may be granted or reserved."

Quoting from Brennan v. Hunter, 68 Oklahoma, 172 Pac. 49, the court says:

"The lease from Hill to Hunter and associates conferred on the lessees the right to go on the premises and search for oil within the initial period, and to commence operations within that period, and continue same until it was determined whether the premises were barren, or oil and gas, or either of them, were found thereon in paying quantities, and, while the lessees acquired no vested estate in the premises prior to the discovery of oil or gas, yet they had the right to the possession of the land to the extent reasonably necessary to perform the obligations imposed on them by the terms of the lease."

The lease in the instant case explains fully the nature and extent of the interest passed to the lessees; that is, the lessor grants, demises, leases, and lets unto the lessee for the sole and only purpose of mining and operating for oil and gas and of laying pipe lines and of building tanks, towers, stations, and structures thereon, to produce, save, and take care of said products. The lease by its express terms would terminate unless a well was completed on the land on or before August 23, 1916. The rental provision granted an option to the lessee; that is, that by the payment of the rentals the time for completing the well would be extended another six months. It is immaterial whether that provision be regarded as an option to renew the lease, or extend the terms, or to continue the lease in force, or defer completion of a well, or to extend the time for performance of the condition to complete a well. The payment of the rentals specified on or before August 23, 1916, was a condition precedent to such renewal, extension, or continuance of the lease, or deferring completion, or extension of the time to perform the condition to complete a well. When the option was not exercised, the lease, according to its express terms, terminated on August 23, 1916, because no well was completed on or before that date. The lessee did not agree to pay said sum, and this cannot be called a case of forfeiture incurred for breach of a covenant to pay money, or any other covenant. Up to the 23d of August, 1916, the lease was unilateral to this extent; the lessee could pay or not pay the rentals, and if he did not pay, he would not be liable to the lessor for the same. When the lessee failed to exercise the option to

extend the time, the situation became the same as though no provision for extending the time had been incorporated in the lease. The defendant failing to exercise its option or privilege, its rights are governed solely by the clause providing that the lease should remain in force for a term of five years from date, and if no well was completed on said land on or before the 23d of August, 1916, the lease would terminate as to both parties.

It has been held by a long line of decisions of this court that an "unless" lease, such as is here involved, is a unilateral option. In Kolachny v. Galbreath et al., supra, the court said:

"The Supreme Courts of Kansas and Illinois. in cases where the lease contains a reservation permitting the lessee to surrender or cancel the lease before the expiration of the term, but not allowing the lessor the mutual privilege at will of compelling a surrender, have held that such options and contracts are not invalid at law and not void for want of mutuality, it being the essence of an option contract that it is not mutual, the purchaser paying his money for doing what he agreed to do for the benefit, whether he will perform or claim performance of the contract, and for the consideration received the seller parting with his right of choice."

In the Frank Oil Co. v. Belleview Gas & Oil Co., 29 Okla. 719, 119 Pac. 260, the lease therein provided:

"If no well is commenced on said premises within one year from this date, then this grant shall become null and void, unless second party shall pay to the first party $80 for each year thereafter such completion is delayed, said rental to be paid quarterly in advance."

The court, in construing the lease, said:

"This contract is an option to explore for gas and oil. The rule is settled by this court that when contracts are optional in respect to one party, they are strictly construed in favor of the party that is bound and against the party that is not bound. Kolachny v. Galbreath et al., 26 Okla. 722, 110 Pac. 902; Jones v. Moncrief-Cook Co., 25 Okla. 856, 108 Pac. 403."

To the same effect, see Deming Inv. Co. v. Lanham, supra; Mitchell v. Probst, supra. By the terms of the lease in controversy, the lessee acquired a vested right to explore until August 23, 1916, with an option to renew the term for successive semi-annual periods, not exceeding five years from the date of the lease. This lease is, in fact, a lease from half year to half year, not exceeding five years. The payment of the rental was a necessary condition precedent to the renewal of the lease for the fractional times specified in the lease contract. After

the 23rd day of August, the lessee, so long as he paid the rentals in the manner provided, had an option to continue the lease in force, but for not more than five years, without drilling the well. While we have stated that the lease in question was unilateral in some respects, we are aware that the $1.00 per acre paid at the execution of the lease and the agreement to commence a well on the block of acreage in six months are a sufficient consideration to support not only the grant of the privilege to mine and operate on the land covered by the lease from the date of the lease to August 23, 1916, but it also supported the unilateral option granted to renew the lease for successive half-yearly terms, not exceeding five years, by the payment of $80 in advance.

The lease here involved was for a term of five years from the date thereof, and as long thereafter as oil or gas, or either, might be produced from the land; but the lessee took the lease with the condition to be performed for the privilege of extending the time for drilling, and, as we have seen, in order to extend the time of drilling, it was necessary to pay the rentals stipulated in the lease. This brings us to a consideration of the defense contained in the amendment to defendant's answer: that is, that the defendant intended at the time to pay the rentals stipulated and provided for in the lease in case a well should not be completed on plaintiffs' premises; that the defendant acquired the block of leases, and on June 4, 1916, in compliance with the agreement to commence a well on the block of leases in six months, it commenced a well on a tract which corners with the lease in controversy, and was comprised within the block of leases of which the lease in controversy was a part; that it proceeded to drill the well with due diligence, and that it fully intended to exercise its option to delay drilling on the tract in controversy, and to pay all rentals promptly when due; that all of the leases in this block except five provided for payment of rentals annually, and these five, including the lease in controversy, provided for semi-annual payment; that the agent of the defendant company whose duty it was to look after the payment of the rentals upon these leases was informed by the agents, servants, and employes of the defendant having custody of said leases prior to the time said leases and the payment of said rentals were taken over by this agent, that all of said block of leases, including the lease in controversy, provided for the payment of rentals annually, and that this agent did not discover otherwise until August 26, 1916, three days after the lease had expired. There is no claim that the defendant was prevented

from exercising its option by any act of the lessor, or by Providential intervention. The claim for relief is based upon the ignorance or mistake of the agent in not knowing that the rentals were due on the 23d day of August, 1916.

The agreement to drill on the block was part of the consideration by which the lessee secured the option to extend the lease by payment of the $80 on or before August 23, 1916, and thereby extend the time for completing a well on the premises leased. Commencing the well on the Hoy lease, as it had agreed to do as part of the consideration, did not bind or obligate the lessee to pay the rentals. That still remained optional with the lessee. Suppose instead of the lessee finding oil or gas in a test well, the same had been dry and the lessee had concluded it did not desire to continue the leases on this block and had refused to pay the so-called rentals. The lessors were without remedy to force the payment of the same. In Jones v. Moncrief-Cook Co., supra, it is said:

"Courts will view any delay with great strictness where the party seeking to enforce the performance of a contract was not bound; the other party thereto being bound."

In section 863, James on Option Contracts, it is stated that the general rule is subject to the qualification that courts of equity may and do grant relief to the optionee in default in cases where the delay or failure is attributable to inequitable conduct on the part of the optionor amounting to estoppel, or where there is a mistake, or some other equitable grounds for invoking its jurisdiction, or where there has been Providential intervention. In passing upon questions of this nature, courts of equity examine the stipulations of the contract, and also consider the nature and circumstances of the transaction. The object is to ascertain the leading and controlling intention of the contracting parties, and to carry this into effect. The time at which an action is to be done, or at which a payment is to be made is, in particular cases, the important and indispensable condition which the parties had in view and the controlling consideration for making the contract. When time is of the essence of the contract, it must be performed in accordance with the terms of the contract. In 13 C. J. 688, under the subject of Opinion Contracts, the author says:

"As a general rule a time fixed by a contract within which an option may be exercised is to be regarded as the essence."

In Curtis v. Harris, supra, the second paragraph of the syllabus is as follows.

"Where an oil and gas lease expressly provides that rights of parties shall terminate if no well be drilled within a fixed period, unless the lessee on or before that date shall pay or tender to the lessor a fixed sum, time is of the essence of the contract."

In Mitchell v. Probst, supra, the sixth paragraph of the syllabus is as follows:

"In case of an option time is of the essence of the contract, unless the contract expressly provides that it shall not be."

In section 839, Pomeroy's Equity Jurisprudence, the rule is stated that mistake must be distinguished from that inattention or absence of thought which are inherent in negligence. In the same section, the learned author says:

"Equity will not relieve a person from his erroneous acts or omissions resulting from his own negligence."

In Bostwick v. Mutual Life Ins. Co. of New York, 116 Wis. 392, 92 N. W. 246, 67 L. R. A. 705, the court said:

"Mere ignorance of the contents of a paper by one, who becomes a party thereto under a mistake as to its import, will not enable him to avoid his act. * * * He who is inexcusably negligent in a business transaction forfeits the right to judicial remedies for relief, and not because of any favor or indulgence which the law extends to the wrongdoer, but because of failure on the part of the injured person to exercise that care for his own protection which the policy of the law requires as a condition of its protection, such policy being to aid only those who exercise some reasonable care to guard their own interests."

In Louisiana Realty Co. v. City of McAlester, 25 Okla. 726, 108 Pac. 391, the plaintiff had paid taxes on certain lots and sued to recover the same on the ground that the lots were not subject to taxation until the final payment to the government had been made thereon. It was agreed that the final payment had not been made, but plaintiff alleged he did not know that fact and paid the taxes in the mistaken belief that such payment had been made. This court denied relief for the reason that the mistake was caused by plaintiff's own neglect of duty. Justice Kane, in delivering the opinion of the court, said:

"It is quite plain that the plaintiff had means at hand easily accessible and convenient whereby it could have informed itself of the fact that it claimed to be ignorant of. The deed records of the Central judicial district, at McAlester, were located in the city of its principal place of business. These records would show whether or not the patent to the lots was on record, and would supply other facts sufficient to give one examining them a fairly good idea of the status

of the property. The records of the Interior Department. at Muskogee, were also open to inspection, and a letter to the Indian Agent would, no doubt, have called forth all the information the plaintiff lacked. That its officers and agents were familiar with conditions attending the town lots in the Indian Nation is quite apparent from the record, as it shows that the corporation had purchased and owned, at the time the taxes were assessed and paid, in the neighborhood of 100 lots in McAlester. Under the state of the record, the court below must have decided the case against the plaintiff on the theory that the mistake of fact complained of was caused by the neglect of duty on its part."

In Edwards v. Iola Gas Co., 65 Kan. 362, 69 Pac. 350, the first paragraph of the syllabus states:

"While a stipulation in an oil and gas lease, providing for a forfeiture of the lease for nonpayment of rent reserved, is inserted for the benefit of the lessor, and is to be strictly construed for his benefit and protection, yet where the time of payment of such rental is neither in express terms nor by necessary implication made of the essence of the lease between the parties, equity may excuse the default in payment, and will not declare a forfeiture and cancellation of the lease in a case where it would be inequitable and unconscionable to so decree."

In Seeley v. Bacon et al. (N. J.) 34 Atl. 139, the court said:

"But what degree of vigilance is to be exercised must depend upon the facts of each case. Where the act done by mistake is one calculated to induce others to take a line of conduct which would put them to loss if the mistake is corrected, it ought to be clear that the party asking for relief has been led into the mistake in spite of the employment of the highest degree of vigilance."

The facts in the case of Frank Oil Co. v. Belleview G. & O. Co., supra, are, in many particulars, exactly like the facts in the case at bar. In the Frank case it was provided that the lease should be null and void unless a well was commenced within 30 days from the date thereof on certain lots belonging to Benj. L. Gibson. The well on the Gibson tract was commenced within 30 days, but no well was commenced on the leased premises within one year from the date mentioned in the lease, nor had possession been taken thereof prior to the time of the alleged forfeiture. The court said:

"Here we have a contract that is unilateral; the lessee being bound to do nothing, except at his own option. It had expended no money by way of developing the lessor's property. The well that was sunk on the Gibson tract was in all probability sunk in accordance with the contract made with the owner thereof to prevent a forfeiture of that

lease, and such was in all probability the case where other wells were sunk on adjoining lands. The lessor had no direct interest, so far as this record discloses, in the development of the Gibson tract. This contract clearly. contemplated the exploration for oil as a speculation or promotion on the part of the lessee, which is permissible under the law. The consideration for the first year's delay in making this development on lessor's tract was $200 cash in hand paid, and the commencement within 30 days from the date of the lease of the sinking of a well on the Gibson tract. That year elapsed and no well was sunk or begun on the tract of the lessor. The lessee had the option to be allowed additional time as delay in the exploring of lessor's tract by paying the lessor $80 for each year thereafter such completion was delayed; such delay money to be paid quarterly in advance."

Further on in the opinion, it is said:

"It is further contended that the lessor was estopped from declaring this forfeiture. The quarterly payment due on October 15, 1907, was sent by check from Independence, Kan., on that date, reaching Lowe on October 16th, the next day, which was accepted by him. The second quarterly payment was sent from Independence, Kan., by check on January 11th, reaching him prior to January 15th. The third quarterly payment, according to the finding of the trial court, was not sent from Independence, Kan., until April 20th, five days after the date said quarterly payment was permitted to be made and two days after the forfeiture had been declared. The trial court held that the accepting of the one payment one day late was not sufficient to show that the lessor reasonably indicated to the lessee that he would waive the strict compliance with that part of the option, to wit, the time of payment. We cannot say that in that he erred, for as the time approached in which he was to make the second payment, the same was mailed four days before the time expired in which he was permitted to make such payment, when it would only take one day for the check to reach the lessor. The record rebuts the idea that the acceptance of the check one day late one time misled the lessee, for the lessee, when he made the second payment, evidently acted on the assumption that he was bound to make such payment by the 15th of the month by mailing the check in ample time for it to reach the destination. There is no question in this case as to the miscarriage of the check by mail, or the lessee being thereby prevented by an unavoidable casualty or misfortune from making such payment."

In the case at bar, the lessee commenced the well on the Hoy tract adjoining the land in controversy, but no well was completed on the leased premises within the time stipulated in the lease, nor had possession been taken thereof by the lessee. What was said

in the opinion in the Frank case, with equal propriety can be said in the instant case. The lessor here had no direct interest, so far as the record discloses, in the development of the Hoy tract. This contract clearly contemplated the exploration for oil as a speculation or promotion on the part of the lessee. In fact, as we view the Frank case and the instant case, it occurs to us that one would be forced to search diligently to find any two cases more alike in all respects than these two.

In Melton v. Cherokee Oil & Gas Co., supra, the oil company had what is known as a "secretarial lease", executed before allotment by the Secretary of the Interior. After allotment, Melton became the owner of the land. It was agreed between him and the oil company that a commercial lease should be substituted for the secretarial lease, to become effective when the former lease was released by the Secretary of the Interior. Accordingly a new lease was drawn, which contained this provision:

"Second party agrees to commence operations on said premises within one year from the date of release from secretarial lease or pay $1 per acre per annum until the first well is completed or the property hereby granted is conveyed to the first party."

The oil company executed a surrender of the secretarial lease on August 27, 1913. This was forwarded to the Secretary of the Interior, and was approved by him October 13, 1913, but actual notice thereof was not given the oil company until February 13, 1915. The oil company tendered the rentals on February 14, 1915, which the landowner declined. A minority of the court was of the opinion that the "date of the release of the secretarial lease" was the date on which the oil company was advised of the acceptance of the surrender by the secretary. The majority held, however, that the date was that on which the secretary actually acted—October 13, 1913—and that the rentals were due October 13, 1914, and the tender of payment thereof on February 14, 1915, was too late. In speaking of the duty of the lessee to ascertain the date the secretary acted, the court said:

"Of course, what we have said would place it in the power of the secretary to approve the release 'in the privacy of his office,' and leave it to the vigilance of the company to watch his action and ascertain the date of his approval of the release of the secretarial lease in order to determine the date from which it was obligated to commence operation under the commercial lease. But, as the company was obligated to discharge or procure to be discharged, the condition precedent, and made no provision to be informed of the action of the secretary in the premises, which itself had invoked, and, after submitting the release for his approval, never at any time took the trouble to inquire and were not informed of his action until after, by his approval of the release, their rights had not only vested, but five months of the time had expired in which, by the terms of the commercial lease, they had a right to enter and explore, and thereafter wholly expired without entry or exploration, we see no hardship in holding, in effect, that in the absence of any rule or regulation requiring the secretary to notify the company of his approval of their release, the company was chargeable with the duty of ascertaining for itself and at its peril the happening of that contingency. And that, having made no such provision, or exercised any vigilance at all, it must suffer the consequences of its own laches."

Counsel for defendant cite the case of Brunson et al. v. Carter Oil Co., — Fed. —, decided by Williams, Judge of the District Court of the Eastern District of Oklahoma. In that case the original lessor had sold the land. The deed and abstract showing the change in ownership were sent the lessee, and under the terms of the lease the rentals were thereafter payable to the subsequent owner of the land. On May 19, 1918, subsequent to being notified of a change in the ownership of the land, rentals became due. Prior thereto, on April 15, 1918, check for the proper amount was sent by the lessee to the bank designated in the lease as the depository, and the bank was directed to credit the amount so sent to the former owner instead of the then owner of the land. This error was not discovered until after the rentals should have been paid, and proper tender was made soon after the error was discovered. The court uses the following language:

"By a continuance of the payments of the rentals, defendant may pursue the exploration for oil and gas, a right for which it has not only contracted, but also for which it paid a bonus of $540. Without the neglect of any legal duty, having exercised due care relating to said transaction, and having long prior to May 19, 1918, elected and determined to pay said rental due on said date and having shown itself 'ready, desirous, prompt, and eager', and acted within the fixed option time, but said payment not having reached the plaintiffs within such time limit on account of such mistake, plaintiff is not entitled to have said lease canceled, but defendant to retain same as now existing and in force."

Judge Williams delivered the opinion in the Brunson case, and also the opinion in the Frank case. We have great respect for the learning and ability of Judge Williams, and his opinions are entitled to the utmost con-

sideration, and we indulge the presumption that the facts in the Frank case were fully considered by the learned judge in reaching his conclusions in the Brunson case. Evidently, one controlling fact, as Judge Williams has stated in the opinion, is that the defendant had shown itself " 'ready, desirous, prompt, and eager,' and acted within the fixed option time." In the case at bar the defendant did not act within the fixed option time, and no one received any money from it within that time. In the Brunson case the lessee sent the money and it was received by the bank nearly a month before it was due under the terms of the option. In the case of South Penn .Oil Co. et al. v. Edgell, 48 W. Va. 348, 37 S. E. 596, 86 Am. St. Rep., in addition to a cash consideration of $500 paid and covenants for development and payment of royalties, the lessor was to have gas from a well on the premises for domestic purposes. It was further provided that if the lessee failed to keep and perform' any covenant, the lease should be at an end. In delivering the opinion, the court said:

"The officers and agents of the appellees, having lost sight of this part of their lease which was contained in a compromise agreement, sought to compel Mrs. Edgell to sign a new contract of release of risk of damages, and to pay for gas used by her. She refusing to do so, they disconnected her service pipe so as to deprive her of the use of the gas, partly, as they claim, because she was wasting and misusing the gas, but principally, as the evidence shows, because they were not aware of the foregoing stipulation as belonging to their lease. This was a matter of plain negligence on the part of some of the officers or counsellors of the appellees, for they had possession of a copy of the contract, and by proper diligence could have been fully informed of its contents."

And further along in the opinion the court said:

"The question of mistake has little to do with this case, except as furnishing an excuse for the conduct of appellees' agents and to show that they thought they were justified therein and did not act fraudulently or knowingly. Being a matter of negligence on their part, it could not furnish a legal excuse for their conduct."

Relief against the forfeiture was granted the oil company in that case, not because of mistake, but because they were in possession. Complying with the important covenants of the lease and agreements, and for the breach of the less important covenant to furnish gas for domestic use, the lessor had a right of action for and could be adequately compensated in damages. Barrow v. Isaacs & Son, 1 Q. B. (1891) 417, is a case where equitable relief was sought against a forfeiture for

breach of a covenant on the ground of mistake. The mistake alleged in that case was ignorance of the covenant at the time of the breach. The lessee and his solicitor had once known of the covenant, but had forgotten it. The judgment of the court was delivered by Kay, L. J., with whom Lopes, L. J., concurred. In the opinion we find the following:

"I am clearly of the opinion that Messrs. Isaacs must be held responsible for any negligence of Mr. Sydney. Their plea for relief therefrom, explicitly stated, would run thus: 'We admit that we were aware of the necessity of obtaining the plaintiff's consent before making the underlease. The lease to us which imposed that obligation was in our possession. We had forgotten the provision of it. The ordinary course of business required that we should examine the lease before granting the underlease. We admit that we neglected to do so, but we say no harm has been done to the plaintiff, and therefore equity should relieve against the forfeiture.' There must have been thousands of cases in which leases have been forfeited owing to non-performance of covenants through bona fide forgetfulness. Counsel have not cited to us, nor have I been able to find, a single instance in which relief has been given under such circumstances. It is impossible not to see that such relief would be an incentive to negligence. If we were to grant it, hereafter lessees might avoid looking at their leases, lest they should be reminded by them of obligations which it would be more convenient to ignore. Many suits would be instituted for relief on this ground, which, until now, is unknown in the records of the court as one upon which relief would be granted."

·In the case of Shaffer v. Marks, 241 Fed. 139, cited and relied upon by the defendant, the facts are as follows: By the terms of the lease, if a well were not commenced on the premises within 12 months, Shaffer was to pay thereafter the sum of $120 per year, payable quarterly in advance until a well was commenced. These payments could be made directly to the lessors, or deposited to their credit in the Cushing State Bank, at Cushing, Okla. Later, the lessor sold 40 acres of the land to other parties, to whom Shaffer thereafter paid the proportion of the rental applying to that 40 acres. Subsequently, some differences arose between H. L. Marks, one of the lessors, and the Cushing Bank, whereupon Marks wrote Shaffer requesting him to send all payments thereafter to his address in Kansas City, Kan. Then ensued correspondence between Shaffer and Marks relative to the title to the land in controversy having passed to W. J. Blaine and wife; Marks furnished to Shaffer abstracts showing the title in Blaine and wife, also a power

of attorney executed by Blaine and wife, appointing Marks their sole and exclusive agent for the purpose of collecting and receiving such lease rentals. Shortly thereafter, and on March 5, 1915, Marks wrote Shaffer again refusing to receive payments through the Cushing Bank, directing that they be sent direct to him at Kansas City, Kan., or that they be sent to the Central Bank at Kansas City, Kan., to be put to his credit as agent. This March payment was accordingly sent in due time to the Kansas City bank, to be credited to Marks, as agent. The next payment was due June 18, 1915. On the 4th of that month, Shaffer wrote the Kansas City bank, enclosing Chicago exchange for $20, with directions to credit it to Wm. J Blaine in payment of oil and gas lease rentals. This letter reached the bank about the 5th or 6th of June. This Chicago exchange Mr. Lawrence, the president and cashier of the bank, testified he considered good and treated as cash, and that it would have been cashed and paid to Wm. J. Blaine at any time before Marks' notice not to do so, if Blaine had called. It also appears that Shaffer alleged in his petition that the records of his office showed Blaine and wife were the owners of the property, and that by mistake and accident he directed the bank to place the draft to the credit of Blaine instead of Marks; that this mistake was innocently made, and without any intention to defraud or wrong any of the parties. As Blaine had no account and was unknown to the bank, it was held awaiting his appearance. Judge Campbell held, under the facts, that the payment of June 18, 1915, should be considered as having been made in all respects as required by the contract. The case at bar fails to disclose any of the grounds mentioned in the Shaffer case that would entitle it to equitable relief.

We are therefore of the opinion that the demurrer was properly sustained to the fifth subdivision of the answer.

Application has been made to this court by the defendant for the appointment of receiver. As the cause is to be remanded for further proceedings, we decline to pass upon this application, as the same may be presented to the trial court.

We are of the opinion that the judgment of the trial court sustaining the demurrer to subdivisions of the answer Nos. 1, 2, and 3 should be reversed, and that the judgment sustaining the demurrer to subdivision No. 5 of the answer should be affirmed. It is, therefore, ordered that this cause be remanded to the lower court for further proceedings not inconsistent with the views herein expressed.

All the Justices concur, except OWEN. C. J., and HARRISON, J., not participating.